# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-23-00368-CR

---

**James Joseph Luckenbach, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 33RD DISTRICT COURT OF BURNET COUNTY
### NO. 52770, THE HONORABLE J. ALLAN GARRETT, JUDGE PRESIDING

---

### O P I N I O N

James Joseph Luckenbach pleaded guilty to the capital murder of multiple persons. *See* Tex. Penal Code § 19.03(a)(7). The State initially sought the death penalty but agreed to waive it after the plea agreement, and the district court assessed punishment at life imprisonment without the possibility of parole. *See id.* § 12.31(a). On appeal, Luckenbach challenges the district court's denial of his pretrial motion to suppress his incriminating statements to police. *See* Tex. Code Crim. Proc. art. 44.02. He contends that he made those statements only after he was in custody, received *Miranda* warnings, invoked his right to counsel, and was told by police that a statement could "better [his] situation." *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966). He also contends that the district court erred by declining to strike the venire panel that received an erroneous summons instructing prospective

jurors to report for jury service on a date in 2022, instead of 2023. We will reverse the district court's judgment of conviction and remand this cause to the district court.

**BACKGROUND**

The suppression hearing began with evidence about the events leading to Luckenbach's arrest. The Burnet County Sheriff's Office (BCSO) responded to a report of two deceased individuals at a residence off Highway 71. Three days later, shortly after midnight, BCSO Deputy Brian Knowles was leaving the sheriff's office in his patrol car when a dispatcher flagged him down and told him that someone, later identified as Luckenbach, was in the lobby of the sheriff's office to turn himself in for the double homicide. Deputy Knowles drove to the front of the sheriff's office where he saw a truck in visitor parking and a person on the other side of it, who identified himself as Jeff Mallett. The bodycam recording of Deputy Knowles's parking-lot conversation with Mallett was admitted into evidence at the hearing.

Mallett told Deputy Knowles that his friend, James Luckenbach, "who works for the company" was there to turn himself in for "the double homicide they had in Horseshoe Bay." Mallett said that he had spent four hours talking Luckenbach out of killing himself, and that Luckenbach's pistol along with Mallett's pistol were in Mallett's truck. Mallett told Deputy Knowles, "James has got representation." He added that although Luckenbach had confessed to him all day, Mallett was "going to have to talk to the investigators and let 'em know what's going on" because Luckenbach was "not going to say anything." Deputy Knowles asked, "Ok, he said he's not?" Mallett confirmed, "No, he's not." Deputy Knowles went inside the sheriff's office to speak with Luckenbach, who was later questioned by Texas Rangers.

2

The parties dispute, among other things, whether Luckenbach invoked his right to counsel while in custody. During the suppression hearing, the district court admitted into evidence video recordings of four separate interactions between law-enforcement officers and Luckenbach, depicting the events between his early-morning arrival at the sheriff's office and his transport to jail hours later. Texas Ranger Cody Mitchell and BCSO deputies Knowles and John Michael Talamantez testified at the hearing.

In his interactions with law enforcement, Luckenbach said that he had an attorney, that they would go through what they had when he arrived, that he promised to wait for the attorney and take guidance from him, and that he would like to wait for his attorney. Ranger Mitchell confirmed to Luckenbach that the person named "Jeff" who brought Luckenbach to the sheriff's office had called an attorney, who was "en route." Luckenbach was unaware that Mallett told Ranger Mitchell beforehand that he lied to Luckenbach to get him to the sheriff's office and further that another officer—Ranger Nick Hill—learned about this "ruse" from Mallett.

**Deputy Knowles's interaction with Luckenbach**

When Deputy Knowles went into the sheriff's office lobby after speaking with Mallett, he introduced himself to Luckenbach and said that he understood Luckenbach was there to turn himself in. Luckenbach replied, "For questioning, yes sir." Deputy Knowles asked to pat down Luckenbach and for him to turn around. Luckenbach complied and said that he had "never been arrested." Less than a minute after encountering Luckenbach, Deputy Knowles detained him in handcuffs. He told Luckenbach that he was not under arrest but was keeping him handcuffed until another deputy arrived. Luckenbach said he had a "bad shoulder" and asked if

3

he could be handcuffed with his hands in front of him.  Deputy Knowles did not do that but used two sets of handcuffs and adjusted one so that Luckenbach could turn his wrist with his hands cuffed behind him.

Deputy Knowles reiterated that Luckenbach was not under arrest, "just detained," and Luckenbach said, "I know."  Deputy Knowles asked if Luckenbach wanted to speak to detectives.  Luckenbach said he had an attorney representing him and when his attorney arrived, they would "go through" what they had:

> Deputy Knowles: You wish to speak to the detectives, or you don't want to?
>
> Luckenbach: I am here because I have an attorney representing me.
>
> Knowles: Okay.
>
> Luckenbach: Jeff has already contacted the attorney.  In fact, he's probably on the phone with him now.
>
> Knowles: Okay.
>
> Luckenbach: He should be.  And uh, as soon as my attorney gets here, we will go through what we have.
>
> Knowles: Okay.  Fair enough.  I'm just gonna grab your ID.

After Deputy Knowles radioed for a driver's license check, he asked Luckenbach about the attorney:

> Knowles: You said your attorney is en route?
>
> Luckenbach: He's—Jeff is supposed to be calling my attorney.  He said he'd be en route as soon as I turned myself in, so hopefully he's calling him.

Deputy Knowles asked if Luckenbach needed water or anything else, but Luckenbach declined.

About 8 minutes after handcuffing Luckenbach and after a radio call with BCSO Deputy Richard Ciolfi, Deputy Knowles removed the handcuffs. He said they were used until he could figure out what was going on and because officers had taken a firearm from Luckenbach. Luckenbach mentioned that he had threatened to kill himself. After a short pause, he said, "Hopefully he's called the attorney."

Moments later, Deputy Ciolfi advised Deputy Knowles that the Criminal Investigative Division wanted Luckenbach detained in handcuffs and Mirandized. Deputy Knowles told Luckenbach that his partner was going to check with Luckenbach's "boss"[1] to see if in fact Luckenbach's "lawyer or representation" was coming. Deputy Knowles said, "I don't know how long—I think they're getting a hold of investigators to come down to speak with you and your representation, but I don't have a specific timeline for that." This time, Deputy Knowles handcuffed Luckenbach with his hands in front. Luckenbach asked, "This is just for safety again, I'm assuming?" Deputy Knowles replied, "Uh yeah, it's just kinda—I mean really it's just more of—yeah."

Next, Deputy Knowles used a preprinted card to read Luckenbach his *Miranda* rights and then asked him if he understood those rights, which Luckenbach confirmed. Luckenbach asked if he was "under arrest." When Deputy Knowles said he was not, Luckenbach asked if he was "still detained," and Deputy Knowles agreed. He explained that he wanted Luckenbach to be aware of his rights and was not going to question him. Luckenbach then asked to use the restroom. Deputy Knowles said he would need to get his partner, and then Deputy Knowles would walk Luckenbach to a bathroom.

---

[1] "Boss" was a reference to Jeff Mallett, likely based on his comment to Deputy Knowles that Luckenbach "works for the company."

Deputy Knowles held open a glass door at the entrance to the sheriff's office and discussed with Deputy Ciolfi which restroom Luckenbach could use. He also asked Deputy Ciolfi to check whether Mallett had called Luckenbach's lawyer: "I would hate for him to get in there and start talking and then say, 'I asked for my lawyer,' you know what I mean?" Deputy Knowles added, "He's already said he's going to talk—he's going to talk to the investigator, but with his representation, so yeah." Deputy Knowles walked back toward Luckenbach saying, "He's checking on your lawyer." For about 20 minutes more, Luckenbach and Deputy Knowles waited in the lobby until Ranger Mitchell arrived.

**Ranger Mitchell's discussion with Mallett before Luckenbach's interview**

Before interviewing Luckenbach, Ranger Mitchell spoke briefly with Mallett outside the sheriff's office. The bodycam recording of Ranger Mitchell's conversation with Mallett, like the earlier conversation between Deputy Knowles and Mallett, was admitted into evidence at the suppression hearing. Mallett told Ranger Mitchell that he was a former law-enforcement officer and that he was in the drive-thru at Whataburger when Luckenbach called him saying, "'Take care of my wife and kids' and all this bullshit." Mallett drove straight from San Antonio and had been talking to Luckenbach since 9:30 or 10:00 that night. He said Luckenbach was "absolutely" suicidal, and it took him an hour to talk the gun out of his hands.

Ranger Mitchell said he would go inside and see what he could do. Mallett told him that Luckenbach was going to request an attorney—because that was the only way Mallett could get him to the sheriff's office—but Luckenbach did not want to tell them what happened:

> Mallett: He's gonna request an attorney, 'cause that's the only way I could get him over here is he—I promised him I'd get him an attorney. And I told him, you know, I told him a lot of shit to get him over here.

6

Ranger Mitchell: Well then, you've been in the business before so I'm—

Mallett: I lied to him up the ass—

Ranger Mitchell:—not going to bullshit you or anything like that, I'm going to go in there and I'm going to read him his *Miranda*. If he wants an attorney, he's gonna have to ask me for it—

Mallett: No problem at all, no problem at all—

Ranger Mitchell: —but you know, if he wants one, you know, he gets one. Is it your opinion that he wants to tell us what happened—

Mallett: No.

Ranger Mitchell: —or are we going to have to get it all from you?

Mallett: You're going to have to get it all from me.

Ranger Mitchell: So he's over here to be arrested for something he's not confessing to?

Mallett: Correct.

Ranger Mitchell: Okay.

Mallett: That's—that's the shtick. Okay? 'Cause he was gonna—he said, "I'm gonna do one of three things tonight, Jeff. I'm gonna kill myself, I'm gonna haul ass to Mexico, or I'm gonna turn myself in."

Ranger Mitchell: Um-hm.

Mallett: And that's—and that's exactly where we're at.

Ranger Mitchell: Jeff, did he tell you why he killed 'em?

Mallett: Yes.

Ranger Mitchell: Which was—

Mallett: He told me everything.

Mallett further said that Luckenbach was "freaked out" because someone told him that the sheriff's office had some DNA evidence and that Luckenbach told him where the evidence was and talked about the weapon and the shell casings. Ranger Mitchell told Mallett that he would get more details but had to "go handle" things with Luckenbach.

**Deputy Knowles talks to Rangers and Investigator before Luckenbach's interview**

Ranger Mitchell left Mallett and entered the lobby of the sheriff's office, where Luckenbach was waiting with Deputy Knowles. Ranger Mitchell introduced himself, received confirmation that Luckenbach no longer needed to use the restroom, and then said he was going to get something from his truck and would come right back. When Ranger Mitchell stepped out of the lobby, Luckenbach asked about his attorney:

> Luckenbach: Have they confirmed whether the—my attorney is coming yet?
>
> Deputy Knowles: I will make sure that the Ranger is tracking that. I asked my buddy to have—to make sure your boss did in fact, uh—like I said, I'll inform the Ranger, but you can also let him know, hey I'm waiting for my representation.
>
> Luckenbach: I should make sure he's actually coming.

When Ranger Mitchell returned, he and Deputy Knowles escorted Luckenbach, still handcuffed, to an interview room located behind a secured and restricted-access door in the sheriff's office. Luckenbach had been detained by Deputy Knowles for about 36 minutes before going into the room. Ranger Mitchell and BCSO investigator Joe Saldivar asked if Luckenbach wanted coffee, water, or anything to eat, but Luckenbach declined.

Before Luckenbach's first interview began, Deputy Knowles privately told Saldivar, "He's waiting on his boss to call his attorney. So, he's pretty adamant that he's waiting

for his attorney." Saldivar asked if Luckenbach requested an attorney before Deputy Knowles read the *Miranda* warnings. Deputy Knowles confirmed, "The first things out of his mouth was, he said he wanted to talk, but with his—but with representation, so I guess maybe he is asking for a lawyer with that statement." Also before the first interview, Deputy Knowles told Ranger Mitchell privately, "He's waiting on his boss to call his lawyer." Ranger Mitchell asked if Luckenbach said, "I want a lawyer." Deputy Knowles recalled, "He said, 'Has my boss called my lawyer?'" Ranger Mitchell said, "I don't give a shit if he has a lawyer or not, he has to ask me for one, but he did not say, 'I want a lawyer.'" Deputy Knowles explained, "He said he had a lawyer is all he said."

Deputy Knowles then met Ranger Hill in the parking lot of the sheriff's office. He shared that Mallett was supposed to contact Luckenbach's lawyer. Ranger Hill said, "Yeah, he told me. It was a ruse." Ranger Hill added, "It's up to him to invoke. So, he may think a lawyer's coming but 'til he actually asks for one—." Deputy Knowles said, "Gotcha. I just wanted to relay that."

**Luckenbach's first interview with Rangers Mitchell and Hill**

Before questioning began in the interview room, Luckenbach asked Ranger Mitchell, "Was somebody able to confirm that my repre—my attorney was on the way?" Ranger Mitchell said, "Uh, the guy that drove you over here, um, said that he is—I guess from San Antone or something like that?" Ranger Mitchell, explained that he was waiting for another Ranger to arrive, that he was going to read *Miranda* warnings to Luckenbach, and that he wanted Luckenbach to understand "the totality of what it means if you do decide that you want an attorney, to be represented, um, and how we'll have to proceed, uh, based on that." Ranger

9

Mitchell said he appreciated Luckenbach "doing the right thing." He continued, "For every decision that we make, uh, you know, whether for instance if it's an attorney or no attorney, there's good things that come with that, but there's also bad things that come with it. I'll explain those, I'll let you make the decision in the end, okay?" About 10 minutes later, Ranger Hill entered the interview room.

Ranger Mitchell told Luckenbach that they had heard that he wanted to confess, and that he was a person of interest on a list with about 15 or 16 other people that they had been going through. But he said that the Rangers do not charge and convict people that just want to confess to a crime because sometimes people confess to crimes that they did not commit. Ranger Mitchell told Luckenbach that he was "being detained for investigative purposes" and was "not technically under arrest," although that could change, depending on how the rest of the night "play[ed] out."

Ranger Mitchell said that the case was being investigated as a capital murder and that offenses such as murder, criminally negligent homicide, and deadly conduct are classified based on whether there are any mitigating circumstances for the death. But the only ones who knew whether there were any mitigating circumstances were the dead people and Luckenbach, if he committed the crime. Ranger Mitchell also said that the evidence at the lab would eventually determine whether Luckenbach did it and that whatever Luckenbach wanted to tell the Rangers was up to him. Ranger Mitchell noted that although defense attorneys say, "Don't say anything," which helps with exoneration or getting a lesser sentence, it also means going with the physical evidence without any information from the person who is speaking to law-enforcement officers, and that is the "crapshoot" that Luckenbach had to decide. Ranger Hill added that whatever

Luckenbach chose to tell them, if he had a reason for what happened, they wanted to document it and be able to share Luckenbach's side of the story to help him the best that they could.

Ranger Mitchell read *Miranda* warnings to Luckenbach, who confirmed that he understood them.[2]   Ranger Mitchell told Luckenbach that his attorney was en route, and Luckenbach said that he wanted to wait for him:

> Ranger Mitchell:  Okay, uh, understanding those rights, do you want to give your side of the story?
>
> Luckenbach:  Have, has anybody confirmed that my attorney is on the way?
>
> Ranger Mitchell: The guy that brought you over here, um Jeff, I think uh is his name?
>
> Ranger Mitchell: Jeff.
>
> Ranger Mitchell: I just talked to him very briefly, he said that he called your attorney and your attorney is en route.[3]
>
> Luckenbach: Okay.
>
> Ranger Mitchell: Okay.
>
> Luckenbach: I'm going to say that I would like to wait for my attorney because I've already heard the statement that I'm here to confess and that's not what I'm here to do.

---

[2]   Ranger Mitchell testified that he read the *Miranda* warnings at that time because he knew that Luckenbach had been involved with law enforcement before Ranger Mitchell arrived, Luckenbach was handcuffed when Ranger Mitchell arrived, and Ranger Mitchell was unsure whether "something had taken place that rose to the level of actual custody" of Luckenbach.

[3]   As discussed earlier, Mallett never said that he called an attorney for Luckenbach or that an attorney for Luckenbach was en route.  Rather, Mallett told Ranger Mitchell—before Luckenbach's first interview—that he lied when he promised Luckenbach that he would get an attorney for him.

Ranger Mitchell said that he was only relaying what Mallett told him, which was that Luckenbach had gone there to confess. Ranger Mitchell told Luckenbach that although "this is a[n] investigative detention right now because of the circumstances, once we know that you're not guilty of anything, you'll be free to leave, so it's a misunderstanding it sounds like." Luckenbach stated that he was there because others were being asked questions that pertained to him, he disliked being a third or fifth "cog in a wheel," he "wasn't waiting until noon or one o'clock tomorrow to get this over with," and the only way he "could get an attorney of the quality that is coming was to do what [he] did" that night.

Ranger Hill removed Luckenbach's handcuffs as Ranger Mitchell said, "[Y]ou were being detained for investigative purposes but, um, I mean if you didn't do it, you're not under arrest." Ranger Mitchell said that they would not force Luckenbach to talk to them, noted that the door to the interview room was closed for privacy but unlocked, and told Luckenbach that they would now walk him to the front if he wanted to leave.[4] Luckenbach replied, "I gave Jeff my word that I would wait for the attorney to get here and take guidance from the attorney." Ranger Mitchell responded, "Well, we can make an appointment tomorrow to talk to you then with the attorney and we can go back to sleep." Luckenbach, who did not have a phone with him, said that he was "not in direct contact with this attorney," so he did not know what he was doing and was unsure if walking out would make the attorney decline representation. Ranger Mitchell said he and Ranger Hill were not going to sit there waiting on an attorney, and they could "talk to the attorney tomorrow." Ranger Mitchell returned Luckenbach's driver's license.

---

[4] Luckenbach was in handcuffs for about 66 minutes before having them removed and being told he was free to leave.

12

Luckenbach apologized for wasting the Rangers' time and explained, "I expected my attorney to be here already so we could have a conversation."

**Ranger Mitchell speaks with Mallett again before Luckenbach's second interview**

Ranger Mitchell walked Luckenbach just outside the front doors of the lobby to the sheriff's office and told him that he was going to keep him separate from Mallett while he spoke to him again. Luckenbach asked if he could use the restroom, and Deputy Knowles escorted him back inside, allowed him to use the restroom, and then returned him to the lobby. Deputy Ciolfi asked Deputy Knowles to keep Luckenbach there while they were getting some information.

Meanwhile, Mallett reported to Ranger Mitchell details about the crime that Luckenbach had provided. Ranger Hill went into the lobby and told Luckenbach that Mallett had been talking to the Rangers about the conversation he had with Luckenbach. Ranger Hill asked Luckenbach, "Is there anything that you would like to talk about right now?" Luckenbach said, "No." Ranger Hill told him that he was "no longer free to go" and that he was being "detained." This occurred about 6 minutes after Luckenbach walked outside the sheriff's office. Luckenbach was handcuffed again, put in leg shackles, and escorted to a "soft-interview room," where he waited with Deputies Knowles and Ciolfi for about 5½ hours.

**Ranger Mitchell's second interview with Luckenbach**

Ranger Mitchell interviewed Luckenbach, who remained in handcuffs and leg shackles, a second time. He re-read Luckenbach his *Miranda* rights at 9:21 a.m.—9 or 10 hours after Luckenbach was first handcuffed—and said he was under arrest. Luckenbach asked if his attorney was there and said he needed to know whether he had the attorney that he was told he

13

would have.   Ranger Mitchell said Luckenbach could find out what was going on with the attorney, but that was going to happen "after this conversation":

> Ranger Mitchell: Obviously, situation's changed since the last time that we talked. You are officially under arrest, not free to go. . . .   Uh, obviously we know a little bit more now than we knew before.   Enough to charge you with an offense. . . . The one thing that we don't know is the thought process and any mitigating circumstances that for lack of better words could possibly better your situation.   I don't know if you have anything that could better your situation, but it's up there and I don't know it.   Um, so I am gonna ask you if you would like to speak to me without an attorney present or if you want to invoke your right to have an attorney present before you speak to me.
>
> Luckenbach: Do we know if Rocky's here?
>
> Ranger Mitchell: No attorney has come over here, um, asking for you.   No attorney's come here period.   And I don't know who Rocky is.   Uh, I understand he's an attorney, but I haven't been in contact with anybody that is an attorney representing you.
>
> Luckenbach: I need to know if I have an attorney that I was told I was gonna have or not.
>
> Mitchell: Okay, um—
>
> Luckenbach: But I don't have his phone number, and I'd have to get with Jeff to get it.
>
> Ranger Mitchell: Now all of that being said, you're gonna have the opportunity to make a phone call and you know um, uh try to get an attorney or find out what's going on with this attorney that—that you had spoken to or whatever.   The thing is, that's gonna happen after this conversation, but the length of this conversation, the content of this conversation is dependent on whether or not you are willing to speak to me with or without an attorney present.

Ranger Mitchell also told Luckenbach that although there was no way to make this situation worse, mitigating circumstances might make it better:

> Right now, you're under arrest for a capital murder.   That's about as bad as it gets. There's no way to make this situation worse.   There may, depending on the

14

mitigating circumstances, the information that only you know in your head that might make it better. I don't know if that's the case, but I have to evaluate that information based on what it is. If you think there is no way to make it better, then, you know, maybe—maybe you shouldn't talk. If you think there's information that I need to know, that might change the outlook of this and possibly change it to a different charge, you know, that's what you need to evaluate whether or not you want to talk about. I don't know if that's the case because obviously I don't—I don't know what's in your head. . . . [I]f you did evil and you know you did evil, then maybe your best bet is not to talk to me. If you did not do evil, I need to understand how it was something other than the way it looks right now.

. . . .

I'm not gonna be mad at you either way. These are your rights, and I respect them. But I have to have an answer from you before I can start asking you questions and before you can tell me information that may or may not make your situation better . . . . I don't know if there's any mitigating circumstances. That is basically what I'm asking you. Is there something that I need to know, that needs to be considered, that me, a judge, a jury, anybody needs to know?

Ranger Mitchell testified that up to this point, Luckenbach had not waived his *Miranda* rights.

Luckenbach told Ranger Mitchell that there was "a lot" that needed to be known. He then asked whether law enforcement had involved his family. Ranger Mitchell answered that Luckenbach's family had been involved and unless things went in a different direction, it was probably going to continue, including "search warrants of the house, and having to interview [his] wife, having to interview [his] children" and "anything that we can to find the truth, and if we're not getting it from you, if you decide that you're not talking to us, we've got no other option but to start exercising other avenues." Luckenbach explained that he turned himself in "because Jeff had an attorney on the way" and because he wanted to avoid family involvement as much as possible. He then asked about punishment ranges for different grades of felonies. When Ranger Mitchell discussed third-degree felonies, Luckenbach said, "I don't see this getting down there." Ranger Mitchell reiterated that it could not get worse than capital murder, the only

possibility was trying to lower it and better the situation. Luckenbach replied, "I guess all that we can do is start asking questions and move forward." He confessed to the offenses, detailing his preparations before going to the victims' home, admitting he shot them, and explaining that he collected the shell casings, melted down the barrel of the AR-15 rifle he used, and burned the headlamp, clothing, mask, and gloves he had worn.

**Conversation with Luckenbach during jail transport**

After confessing to Ranger Mitchell, Luckenbach was transported to jail by BCSO Investigators Talamantez and Robert Stinehour. While waiting in the patrol car to enter the jail, Luckenbach volunteered, "My first time in the back of one of these." Investigator Stinehour responded, "Sorry it ended up that way, man." Luckenbach replied, "No I deserve it. I did it." Investigator Stinehour said, "I know, but I'm sorry you ended up in that direction."

Luckenbach was indicted for capital murder. He filed a pretrial motion to suppress, contending that his statements to law-enforcement officers were obtained in violation of his constitutional right to remain silent and right to counsel. He also filed a pretrial motion to determine the admissibility of his written or oral statements, contending that they were not made voluntarily. The district court denied both motions after the suppression hearing and entered findings of fact and conclusions of law. Soon after his motions were denied, Luckenbach waived his right to a jury trial and pleaded guilty. He then filed this appeal.

**DISCUSSION**

Luckenbach contends that the district court erred by denying the motion to suppress his incriminating statements to police because when he made those statements he was in custody, had invoked his right to counsel, received *Miranda* warnings, and had been told by

16

police that a statement could better his situation. "We review a trial court's ruling on a motion to suppress using a bifurcated standard for an abuse of discretion." *State v. Espinosa*, 666 S.W.3d 659, 667 (Tex. Crim. App. 2023); *Pecina v. State*, 361 S.W.3d 68, 78-79 (Tex. Crim. App. 2012). We give deference to a trial court's findings of fact that are supported by the record and on application of law to fact questions that turn on credibility and demeanor. *Espinosa*, 666 S.W.3d at 667; *Pecina*, 361 S.W.3d 78-79. That same deferential standard applies to a trial court's determination of historical facts that are based on a video recording admitted into evidence at a suppression hearing. *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013). We review de novo the trial court's determination of legal questions and mixed questions that do not turn on credibility and demeanor. *Espinosa*, 666 S.W.3d at 667; *Pecina*, 361 S.W.3d 79. We view the evidence and all reasonable inferences in the light most favorable to the trial court's ruling and uphold that ruling if the record supports it and if it is correct under any legal theory applicable to the case. *Espinosa*, 666 S.W.3d at 667.

Luckenbach filed a pretrial motion to suppress and a trial brief contending that

- On September 2, 2021, while in the custody of law enforcement officers, Luckenbach made certain statements in response to questions by the officers, and at the time, he was significantly deprived of his freedom to the extent he was not permitted to leave;

- The statements were obtained in violation of Luckenbach's right to remain silent and right to counsel as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 10 and 19 of the Texas Constitution; and Articles 1.04 and 1.05 of the Texas Code of Criminal Procedure; and

- The statements were not taken in accordance with the statutory requirements of Texas law pertaining to the admissibility of statements, and thus were obtained in violation of the requirements of Articles 38.21, 38.22, and 38.23 of the Texas Code of Criminal Procedure.

17

After the hearing on the motion to suppress, the district court issued findings, including that Luckenbach was not in custody until after his arrest and second interview with Ranger Mitchell, that Luckenbach did not unambiguously advise Ranger Mitchell that he did not want to talk to him, and that Luckenbach did not unambiguously advise Ranger Mitchell that he did not want to talk to him without a lawyer present. In his challenge to the denial of his motion to suppress, Luckenbach contends that those fact findings are belied by the record. We consider the custody question first because—as we explain further—if Luckenbach was not in custody of law-enforcement officers, he was not entitled to a lawyer during their questioning.

**Custodial interrogation by Texas Rangers**

The Fifth Amendment privilege against self-incrimination prohibits the government from compelling a criminal suspect to bear witness against himself. *Pecina*, 361 S.W.3d at 74-75 (citing U.S. Const. amend. V); *see Miranda*, 384 U.S. at 442. In *Miranda*, the United States Supreme Court provided safeguards to protect the privilege against self-incrimination in the "inherently coercive atmosphere of custodial interrogations." *Pecina*, 361 S.W.3d at 75 (citing *Miranda*, 384 U.S. at 441). Texas incorporated the *Miranda* requirements into article 38.22 of the Code of Criminal Procedure, which sets out specific warnings that must be provided to an accused during a custodial interrogation. *See* Tex. Code Crim. Proc. art. 38.22, §§ 2-3. Both *Miranda* and article 38.22 deem statements produced by custodial interrogation to be inadmissible unless the accused is first warned of his right to remain silent, that his statement may be used against him, and that he has the right to hire a lawyer or have a lawyer appointed for him. *Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021); *see Miranda*, 384 U.S. at 444; Tex. Code Crim. Proc. art. 38.22, §§ 2-3.

18

Under *Miranda*, "custodial interrogation" refers to "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. "Custodial interrogation" under article 38.22 is the same under *Miranda* and the Fifth Amendment. *Thai Ngoc Nguyen v. State*, 292 S.W.3d 671, 677 n.27 (Tex. Crim. App. 2009); *see Bass v. State*, 723 S.W.2d 687, 691 (Tex. Crim. App. 1986) (construing "custodial interrogation" under article 38.22 as consistent with meaning of "custodial interrogation" under Fifth Amendment). Concerns about noncompliance with *Miranda* or article 38.22 arise only if a person is subject to both custody by a law enforcement officer and an interrogation. *See Miranda*, 384 U.S. at 444; Tex. Code Crim. Proc. art. 38.22, §§ 2-3; *see also Stansbury v. California*, 511 U.S. 318, 322 (1994) (noting that because these measures protect person against coercive nature of custodial interrogation, they are required only where there has been such restriction on person's freedom as to render him in custody); *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011) (same).

A custody determination requires two inquiries: (1) the circumstances surrounding the interrogation; and (2) whether a reasonable person in those circumstances would have felt that he was not free to leave. *Wexler*, 625 S.W.3d at 167 (citing *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)). The ultimate inquiry is whether, under the circumstances, a reasonable person would have believed that his freedom of movement was restricted to the degree associated with a formal arrest. *Id.*; *see Stansbury*, 511 U.S. at 322; *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996). This "reasonable person" standard presupposes an innocent person. *Wexler*, 625 S.W.3d at 167; *Dowthitt*, 931 S.W.2d at 254 (citing *Florida v. Bostick*, 501 U.S. 429, 438 (1991)). In *Dowthitt*, the Court of Criminal Appeals outlined "four general situations which may constitute custody": (1) when the suspect

19

is physically deprived of his freedom of action in any significant way; (2) when a law-enforcement officer tells the suspect that he cannot leave; (3) when law-enforcement officers create a situation that would lead a reasonable person to believe that his freedom of movement has been significantly restricted; and (4) when there is probable cause to arrest and law-enforcement officers do not tell the suspect that he is free to leave. 931 S.W.2d at 255.

As to the first through third situations, the restriction on the suspect's freedom of movement must be to the degree associated with an arrest as opposed to an investigative detention. *Id.* For the fourth situation, the officer's knowledge of probable cause must be manifested to the suspect, and custody is established only if the manifestation of probable cause, combined with other circumstances, would lead a reasonable person to believe he is under restraint to a degree associated with an arrest. *Wexler*, 625 S.W.3d at 168. Whether, under the circumstances, a reasonable person would believe there was a restraint on his freedom of movement to the degree associated with an arrest is an objective test. *Id*. at 167. And because the determination of whether a person is in custody is an objective one, the subjective views of the interrogating officer or the person being questioned are irrelevant. *J.D.B.*, 564 U.S. at 270-71; *Stansbury*, 511 U.S. at 323; *Dowthitt*, 931 S.W.2d at 255.

To evaluate whether a reasonable person in the suspect's situation would have felt that there was a restraint on his freedom to a degree associated with arrest, the record must establish the circumstances manifested to and experienced by him. *Wexler*, 625 S.W.3d at 168. It is the defendant's initial burden to establish that his statement was the product of custodial interrogation. *Id.* Courts are required to examine "all of the circumstances surrounding the interrogation," including any circumstance that "would have affected how a reasonable person"

20

in the suspect's position "would perceive his or her freedom to leave." *J.D.B.*, 564 U.S. at 270-71 (quoting *Stansbury*, 511 U.S. at 322, 325).

We begin by considering all the circumstances surrounding Luckenbach's first interview with the Rangers. The record from the suppression hearing shows that Luckenbach was physically deprived of his freedom of action in significant ways, that he was not free to leave, and that law-enforcement officers created a situation that would lead a reasonable person to believe that his freedom of movement had been significantly restricted. *See Dowthitt*, 931 S.W.2d at 255. Luckenbach was escorted by sheriff's deputies behind a secured door in the sheriff's office that restricts public access from the lobby by requiring them to push a button on a wall panel and have an authorized person "buzz" them in. Luckenbach was then accompanied by the deputies down hallways to an interrogation room equipped with recording devices. Once there, he was questioned by two Texas Rangers, at least one of whom was visibly armed, behind a closed door.[5] During questioning, Luckenbach was handcuffed and had no phone, and one of the Rangers was keeping his driver's license. Because Mallett gave him a ride to the sheriff's office, Luckenbach had no vehicle there. An expectation of a confession was communicated to Luckenbach. He was told he was a person of interest. He was told that he would have to be escorted to the restroom. Further, a Ranger told Luckenbach that although he was not "technically" under arrest, he would not be free to leave until his guilt was ruled out: "[O]nce we know that you're not guilty of anything, you'll be free to leave." We conclude that the circumstances surrounding Luckenbach's interrogation, considered in their totality and objectively, establish that a reasonable person in this situation would have believed that his

---

[5] Luckenbach was not told that the door was unlocked until later in the interview, after Ranger Hill removed his handcuffs.

21

freedom of movement was restricted to the degree associated with a formal arrest as opposed to an investigative detention, and would not have felt free to leave. *See Wexler*, 625 S.W.3d at 167-68; *Dowthitt*, 931 S.W.2d at 254-55. Thus, the record does not support the district court's conclusion that Luckenbach was not in custody before his second interview with Ranger Mitchell. We proceed to consider whether Luckenbach invoked his right to counsel during his custodial interrogation with the Texas Rangers.

**Invocation of right to counsel during custodial interrogation and *Edwards* violation**

The Fifth Amendment right to have an attorney present during police interrogation applies to any offense about which the police might want to question a suspect. *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009) (citing *McNeil v. Wisconsin*, 501 U.S. 171 (1991)). If a suspect requests counsel at any time during his interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation. *Davis v. United States*, 512 U.S. 452, 339 (1994); *Gobert*, 275 S.W.3d at 892. When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation, even if he has been advised of his rights. *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). Under the *Edwards* rule, a voluntary *Miranda* waiver is not sufficient at the time of subsequent attempts at interrogation if the suspect initially requested the presence of counsel. *Maryland v. Shatzer*, 559 U.S. 98, 105, 107 (2010) (distinguishing *Edwards* and similar cases by noting that when suspect is released from custody and returned to his normal life before another attempted police interrogation, there is little reason to think his change of heart about interrogation without counsel was coerced). The *Edwards* rule

22

does not take into account any good intentions of the individual police officer, lack of official coercion or badgering, or voluntariness of a person's custodial statement. *McCarthy v. State*, 65 S.W.3d 47, 52 (Tex. Crim. App. 2001).

When, as here, an *Edwards* violation is alleged, courts engage in two inquiries: (1) whether the accused actually invoked his right to counsel and, if so, (2) whether he initiated further discussions with the police, and knowingly and intelligently waived the right he had invoked. *Smith v. Illinois*, 469 U.S. 91, 95 (1984). "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.'" *Davis v. United States*, 512 U.S. 452, 459 (1994) (quoting *McNeil*, 501 U.S. at 178). "Whether a statement referring to a lawyer constitutes a clear request for counsel depends on the statement itself and the totality of the circumstances surrounding the statement." *Davis v. State*, 313 S.W.3d 317, 339 (Tex. Crim. App. 2010). The test is an objective one: whether the suspect "articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* (quoting *Gobert*, 275 S.W.3d at 892-93); *see Davis*, 512 U.S. at 458-59.

Here, Luckenbach contends that he clearly and unequivocally invoked his right to counsel during his custodial interrogation with the Rangers and that his invocation occurred after Ranger Mitchell read *Miranda* warnings because he was unsure whether Luckenbach was already in custody. In response to Ranger Mitchell's question, "Okay, uh, understanding those rights, do you want to give your side of the story?" Luckenbach replied, "I'm going to say that I would like to wait for my attorney because I've already heard the statement that I'm here to confess and that's not what I'm here to do." The Fourteenth Court of Appeals noted that a

23

defendant's similar declaratory statement, "I want to wait for my lawyer then," invoked the right to counsel. *Molina v. State*, 450 S.W.3d 540, 546 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (recognizing trial court's finding that with this statement, defendant "clearly invoked his right to counsel"). Building on his prior statement, Luckenbach told Ranger Mitchell, "I gave Jeff my word that I would wait for the attorney to get here and take guidance from the attorney." And before the interview began, Deputy Knowles communicated his understanding as a police officer that Luckenbach was "pretty adamant that he's waiting for his attorney," and "[t]he first things out of his mouth was, he said he wanted to talk, but with his—but with representation, so I guess maybe he is asking for a lawyer with that statement." Deputy Knowles told Ranger Mitchell that Luckenbach was "waiting on his boss to call his lawyer," and Ranger Mitchell asked if Luckenbach had said, "I want a lawyer." When Deputy Knowles recalled that Luckenbach had not used those precise words, Ranger Mitchell said, "I don't give a shit if he has a lawyer or not, he has to ask me for one, but he did not say, 'I want a lawyer.'"

However, to invoke his right to counsel, a suspect need not "utter the magic words, 'I want a lawyer.'" *Montoya v. Collins*, 955 F.2d 279, 283 (5th Cir. 1992); *Dewberry v. State*, 4 S.W.3d 735, 747 n.9 (Tex. Crim. App. 1999) ("There are no magic words required to invoke an accused's right to counsel."). The Supreme Court has noted that a defendant who is unwilling to speak to the police without counsel present need only say as much when first approached and given the *Miranda* warnings. *Montejo v. Louisiana*, 556 U.S. 778, 794 (2009). Luckenbach's words were not tentative or conditional inquiries, but clear and direct declarations of his preference to wait for the attorney that Mallett promised, and that Ranger Mitchell claimed Mallett had called and said was "en route."

24

We conclude that the circumstances surrounding Luckenbach's statement, considered in their totality and objectively, establish that Luckenbach articulated his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. *See Davis*, 512 U.S. at 458-59; *Davis*, 313 S.W.3d at 339; *Gobert*, 275 S.W.3d at 892-93; *cf. Molina*, 450 S.W.3d at 546. Once Luckenbach invoked his Fifth Amendment right to counsel, police interrogation should have ceased until counsel was provided or until Luckenbach reinitiated a dialogue. *See Gobert*, 275 S.W.3d at 892. Neither happened. Nor was Luckenbach released from custody and returned to his normal life before Ranger Mitchell conducted the second interrogation in violation of Luckenbach's Fifth Amendment rights and the rule set forth in *Edwards*. *See Shatzer*, 559 U.S. at 107 (noting that suspect who is released from custody and returned to his normal life for some time before police again attempt interrogation "has no longer been isolated" and "has likely been able to seek advice from an attorney, family members, and friends"); *Edwards*, 451 U.S. at 484. Thus, the district court abused its discretion by denying Luckenbach's motion to suppress his statements in the second interview with Ranger Mitchell at the sheriff's office.

**Harmful error**

Having determined that the district court abused its discretion by denying Luckenbach's motion to suppress, we proceed to consider whether that constitutional error was harmful. *See* Tex. R. App. P. 44.2(a) (providing that if appellate record in criminal case reveals constitutional error that is subject to harmless error review, court of appeals must reverse judgment of conviction or punishment unless it "determines beyond a reasonable doubt that the error did not contribute to the conviction or punishment"). If the denial of the motion to suppress

contributed in some measure to the State's leverage in the plea-bargaining process and may have contributed to Luckenbach's decision to relinquish his constitutional rights of trial and confrontation, we cannot conclude beyond a reasonable doubt that the error did not contribute to his conviction or punishment. *See Holmes v. State*, 323 S.W.3d 163, 173-74 (Tex. Crim. App. 2010); *Chidyausiku v. State*, 457 S.W.3d 627, 630-31 (Tex. App.—Fort Worth 2015, pet. ref'd).

Here, less than two weeks after the district court denied the motion to suppress, Luckenbach decided to plead guilty in exchange for the State's recommendation of life without the possibility of parole. Based on this record, we cannot determine beyond a reasonable doubt that the constitutional error of denying Luckenbach's motion to suppress did not contribute to his decision to plead guilty and thus, to his conviction. *See* Tex. R. App. P. 44.2(a); *Holmes*, 323 S.W.3d at 173-74; *Chidyausiku*, 457 S.W.3d at 630-31. Accordingly, the error cannot be harmless. We sustain Luckenbach's issue challenging the denial of his motion to suppress.[6]

## CONCLUSION

We reverse the district court's order on the motion to suppress, reverse the judgment of conviction, and remand this cause to the district court for further proceedings consistent with this opinion.

_____

Darlene Byrne, Chief Justice

---

[6] We need not reach Luckenbach's remaining issues contending that he was induced to give a statement when he was told by police that a statement could better his situation, and that the district court erred by declining to strike the venire panel. *See* Tex. R. App. P. 47.1.

26

Before Chief Justice Byrne, Justices Triana and Kelly

Reversed and Remanded

Filed:   June 27, 2025

Publish